IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

LUDTKE V. LUDTKE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

MARILYN J. LUDTKE, APPELLANT,

V.

DAVID A. LUDTKE, APPELLEE.

Filed February 2, 2016.    No. A-14-967.

Appeal from the District Court for Lancaster County: ANDREW R. JACOBSEN, Judge. Affirmed.

David P. Kyker for appellant.

Jane F. Langan Mach, of Rembolt Ludtke, L.L.P., for appellee.

MOORE, Chief Judge, and INBODY and BISHOP, Judges.

BISHOP, Judge.

Marilyn J. Ludtke appeals from the decree of dissolution of marriage entered by the district court for Lancaster County dissolving her marriage to David A. Ludtke, and from the order overruling her motion for new trial or, alternatively, to alter or amend the decree. She maintains the district court should have set aside a partial property settlement agreement and ordered a new trial on the basis that she was incompetent when she signed the settlement agreement and at the time of trial. Alternatively, she contends the district court erred in not awarding her alimony, not ordering David to pay certain of her medical expenses, and not awarding her a reasonable attorney fee. She also contends the court erred in adjusting the parties' marital Individual Retirement Accounts (IRAs) for tax consequences prior to allocating them between the parties. We affirm.

- 1 -

BACKGROUND

Marilyn and David were married on November 20, 1988, in Lincoln, Nebraska. No children were born during the marriage; both parties had been married previously. On May 14, 2013, Marilyn filed a complaint for dissolution of marriage. David filed an answer and counterclaim for dissolution of marriage. On June 14, the district court ordered David to pay Marilyn temporary alimony of $1,500 per month and "any reasonable and medically necessary non-covered healthcare expenses." The court also ordered David to pay $3,500 of Marilyn's attorney fees.

A bench trial was held on March 31, 2014; at that time, Marilyn was 65 years old and David was 75. Both parties were represented by counsel. At the commencement of trial, Marilyn's counsel offered exhibit 2, a partial property settlement agreement dated March 31 and signed by the parties, and exhibit 32, a document entitled "Additional Personal Property to be Awarded to [Marilyn]," which supplemented the partial property settlement agreement. Both exhibits were received into evidence without objection.

The partial property settlement agreement provided, in pertinent part, that if the agreement was approved by the court, Marilyn would receive all right, title, and interest in DAMAR Corporation (DAMAR), including all real estate owned by DAMAR. The record reflects that DAMAR owned a total of 255.3 acres of land in Seward County, Nebraska, consisting of 162.7 acres of dry cropland, 87.6 acres of pasture, and 5 acres on which a residence and various buildings were located. Marilyn was also to receive 39.29 acres of land located in Lancaster County, Nebraska, which the record reflects she inherited during the marriage, and a residence on Sumner Street in Lincoln (it is unclear whether the Sumner Street residence was marital or nonmarital). David was to receive a marital residence located in Puerto Rico and a cabin located in Minnesota (it is unclear whether the cabin was marital or nonmarital). The partial property settlement agreement did not list the values of the properties.

Marilyn's counsel also offered exhibit 3, a list of stipulations for purposes of trial, which was received into evidence without objection. It provided, among other things, that "[b]oth counsel stipulate and agree that for purposes of valuing and allocating the parties' retirement accounts that the court may tax effect each account at the rate of 25%."

Marilyn's first witness was her brother, Stanley Hergenrader, who was 63 years old and testified as follows. He moved in with Marilyn at the Sumner Street residence in 2007, after he ceased his employment as a pharmacist. Initially, he did not provide Marilyn with any care. However, Marilyn had very serious surgery on one of her feet in 2008 or 2009, and on her other foot approximately 6 months later. Following the surgeries, Marilyn was in a great deal of pain, and Stanley cared for her. According to Stanley, David was not living at the Sumner residence during that period.

Stanley testified that Marilyn's gait got progressively worse in the years following her foot surgeries. Approximately 18 months prior to trial, Marilyn "had some falls" and "some injuries" to her back and knees. Since then, the level of care Stanley provided to Marilyn had progressed. According to Stanley, Marilyn had diagnoses of knee injury, back injury, lower lumbar sacral injury, and arthritis. She was prescribed physical therapy and medications; however, there were a lot of medications that she could not take because of her severe kidney disease.

Stanley recalled some of Marilyn's falls. In 2013, he and Marilyn were working in the yard clearing brush at the residence in Puerto Rico. Marilyn picked up some coconuts that had fallen off a tree and was carrying the coconuts in a bucket when she fell backwards and hit her back and head. Marilyn had also been pulled down while walking her dog and Stanley's dog.

Stanley described his level of involvement in Marilyn's day-to-day care. Because Marilyn did not drive due to a lack of feeling in her feet, Stanley shopped for her three to four times per week and took her to appointments. Stanley cooked, cleaned, cared for the dogs, and did the housework, yardwork, and laundry. He also had to lift Marilyn out of chairs, assist her going up and down stairs, and help her open bottles and cans. Stanley testified that until September 2013 he paid $500 per month in rent to Marilyn for living in the Sumner Street house; at that time, Marilyn insisted he stop paying rent because of the care he was providing her.

Stanley testified that in March 2014 he purchased a residence in Puerto Rico. Although he was still living with Marilyn in Lincoln at the time of trial, he intended to begin living at the Puerto Rico residence 6 to 7 months of the year. For the remaining months of the year, he intended to live in a farmhouse he owned in Lincoln. Stanley explained he was at a point where he did not believe he could continue providing Marilyn with "safe and adequate care considering the nature of her problems."

On cross-examination, when asked when he planned to stop living with Marilyn, he answered, "When I have a chance to." He explained that first Marilyn needed to "find a facility that will take care of her." Stanley further testified that Marilyn contributed $7,500 toward the purchase price of his home in Puerto Rico; he described the money as "three months' rent up front." Stanley did not envision Marilyn staying in his house in Puerto Rico until she became "more autonomous."

Marilyn, who was 65 years old at the time of trial, testified as follows. She began working at a company in Lincoln in 1973 and retired from the company at the end of 2004. Her final annual salary was approximately $42,000. During the marriage, Marilyn did household chores and yardwork at the parties' 6,000 square feet home (the record is not entirely clear, but it appears she was referring to a former marital residence, not the home on Sumner Street or the Puerto Rico home). According to Marilyn, she and David entertained frequently at their home, and she was the "chief cook and bottle washer." She specifically recalled a dinner party with another couple at which she had seven wine glasses at each place setting. Marilyn also performed work on the farm owned by DAMAR during the marriage, including baling hay and renovating the buildings on the property. For example, she fixed up an old schoolhouse on the farm so that David could use it as an office. Marilyn also recalled caring for David after he had his knees replaced and after he had a severe bout of pancreatitis.

Marilyn further testified that during the marriage, she inherited over $515,000 from an aunt in 1999 and over $150,000 from her mother several years later. She used some of the money to fund part of her granddaughter's law school education in Boston and contributed more than $100,000 toward marital expenses. She estimated she had $140,000 left of the inherited funds.

Marilyn was then asked about the partial property settlement agreement. She agreed that it had taken "a long time to get to this point." She further agreed she had been given an adequate opportunity to reflect on the agreement after talking with her attorney and her brother. She believed

- 3 -

the agreement was fair and wanted the court to approve it. There was nothing about the agreement she did not understand or about which she was confused.

Marilyn next explained her plans for the DAMAR property, which she would receive if the court approved the partial property settlement agreement. She testified she "didn't really want" the property, but had agreed to receive it so that her son could continue to live there. Marilyn planned to sell some of the DAMAR property to a third party and to sell approximately 90 acres of the property to her son. The sales would leave Marilyn with about 80 acres of the DAMAR property, which she planned to rent to her son for $1 per year. In exchange, her son would pay the real estate taxes. Marilyn then planned to purchase 80 acres of her grandfather's former farm in Lancaster County, which was contiguous to the 39-acre tract she previously inherited.

Exhibit 13 was an estimate of Marilyn's income for 2014 and was received in evidence. Exhibit 14 was a letter from a real estate broker estimating the annual farm income Marilyn would receive from the 39- and 80-acre tracts in Lancaster County. The estimate was that Marilyn would receive approximately $15,041 in farm income from the farmland; however, real estate taxes would total approximately $10,326. When the net farm income was added to Marilyn's social security payments and the dividends she would receive from an investment account, Marilyn estimated her annual income would total $24,677.

Marilyn testified that prior to trial she prepared an updated list of her monthly living expenses; the list was received into evidence as exhibit 16. Her expenses totaled between $10,963 and $12,163 per month. The largest single expense was rent for an assisted living facility, which ranged between $2,500 and $3,700 per month. The second largest expense was $2,400 for uncovered medical and dental expenses. Marilyn explained that her psychologist, Dr. Rick McNeese, had worked out a plan for her that required receiving a shot called Vivitrol that cost $1,600 per month and was not covered by insurance. The shot helped with anxiety, depression, and alcohol cravings. Her insurance also did not cover her "prescribed aqua and physical therapy" or the medications she was prescribed for "spasms." Marilyn identified exhibit 29 as a list of uncovered medical expenses she had incurred during 2013 and 2014. The expenses totaled approximately $555. She further testified that her outstanding balance at her psychologist's office was $5,410.28; exhibit 30 was an itemized bill reflecting this balance. She also owed $208 for her aqua and physical therapies. Describing her other medical problems, Marilyn testified she suffered from "third phase" renal disease (the next phase required dialysis), she had her thyroid removed and required medication for that, she had a hysterectomy and required hormones, she was deficient in vitamin D, and she suffered from Raynaud's Syndrome, which caused her hands to be "very cold" and "numb."

During her testimony, Marilyn was shown exhibit 25, a document entitled "Plaintiff's Proposed Allocation of Individual Retirement Accounts." Marilyn agreed the exhibit was her "suggestion to the Court on how to deal with the two IRA accounts that are marital property." She further agreed that the suggestion was to value the IRAs as of December 31, 2013, and "tax effect them as we have stipulated." As of December 31, Marilyn's IRA was valued at $665,320 and David's IRA was valued at $873,337. After reducing them by 25% and dividing them equally, David owed Marilyn $78,006.

On cross-examination, Marilyn agreed the DAMAR property had been appraised at $876,000. She expected to receive $505,000 from selling part of the DAMAR property to her son and part of it to a third party. When asked about renting the remaining DAMAR property to her son for $1 per year, she testified she wanted "nothing to do with it." When asked if she needed the income from the land, she said, "I would care not to do that." She further testified she did not plan to begin withdrawing money from her IRA until she was 70½ years old. She explained that David did not begin withdrawing from his IRA until that age.

When asked about her plans to enter an assisted living facility, she testified she intended to do so but would also keep her home on Sumner Street. She acknowledged that in addition to rent for an assisted living facility, her list of estimated monthly expenses included $1,250 for home maintenance and home health care, plus additional expenses for utilities. Marilyn acknowledged she had not yet applied for a room in an assisted living facility. Her estimated monthly expenses also included $500 for gas and a transportation service that she did not presently use but expected to use once she entered an assisted living facility.

Marilyn also hoped to spend 3 to 4 months per year in Puerto Rico. Partly because of this, her list of estimated expenses included $1,000 for travel per month. She explained that she traveled first class because "we travel with service dogs." She explained that her dog had completed a program called "Angel Dogs" and that the dog brought her things, thus "serving me."

Marilyn's counsel offered a number of additional exhibits that were received in evidence without objection. One was Marilyn's counsel's affidavit and itemized billing statement showing a total of $25,796.16 in attorney fees incurred prior to trial. The exhibits also included the parties' income tax returns and Social Security statements, a deposition of Dr. Daniel Einsphar, and a letter from Dr. Rick McNeese to Marilyn's counsel. To the extent the exhibits are relevant to the appeal, we address them in our analysis section below.

David, who was 75 years old at the time of trial, testified as follows. From 1973 to 1986 he was a full-time professor at the University of Nebraska-Lincoln College of Law, where he taught business and tax-related courses. He then became a partner at a law firm that later became known as Rembolt Ludtke, focusing on business and estate planning. He ceased being a partner at age 65 and became "of counsel" at the firm, before fully retiring at the end of 2013.

David testified regarding exhibit 40, which was received into evidence and which contained estimates of his and Marilyn's annual income for 2014. He estimated his annual income to be $138,565, which included Social Security of $2,172 per month, a withdrawal of $6,000 per month from a premarital retirement account, a withdrawal of $2,500 per month from his marital IRA, and $10,495 annually from an oil investment.

David estimated Marilyn's annual income to be $97,540, which included $1,338 per month in Social Security; $10,264 per year from the Lancaster County farm (based on the average for 2011 to 2013); $5,885 per year in dividends; $5,807 per year in rent for the Sumner Street residence; $34,652 per year from the DAMAR farm including rental of the cropland, pastureland, and house (based on an appraisal received into evidence); and $24,876 per year in IRA distributions (based on withdrawing 4% per year).

When asked about his health problems, David testified he had sleep apnea that required him to use a CPAP machine, he had pancreatitis 2 years prior to trial, he had been diagnosed as a

diabetic and took medication for it, he had both of his knees replaced, and he had spinal stenosis that caused him pain.

On cross-examination, David acknowledged that his estimate of Marilyn's income did not deduct any expenses from her projected farm income. He further testified that the $6,000 per month he withdrew from this premarital retirement account was a mandatory minimum distribution. As of December 31, 2013, the account had a balance of $1,810,880.

On July 14, 2014, the court entered a decree of dissolution of marriage. The court approved the partial property settlement agreement, finding it was reasonable and not unconscionable. The court awarded no alimony, finding that after the parties' property and retirement accounts were divided, they were left with "substantial assets." The court also noted that both parties were retired and received Social Security and Medicare. The court ordered David to pay $218.40 for medications that Marilyn obtained on January 1, 2014; the court found Marilyn had "failed to carry her burden of proof on the remaining medical expenses as being medically necessary non-covered health care expenses." The court also divided the parties' IRAs, valuing them as of December 31, 2013, and ordering David to pay Marilyn $78,006 to effectuate the division. The court ordered each party to pay his or her own attorney fees.

On July 23, 2014, Marilyn filed a motion for new trial or, alternatively, to alter or amend the decree. An evidentiary hearing was held on September 11 and 12. At the hearing, Dr. McNeese testified he had been a licensed psychologist since 1985 and in May 2013 had begun treating Marilyn on a weekly basis. He saw Marilyn on March 28, 2014, just a few days before trial, and on April 4, approximately 4 days after trial. Based on his observations of Marilyn, he believed she had developed acute stress disorder between March 28 and April 4. He explained that the symptoms he observed in Marilyn on April 4 were that she was "quite distraught," she "couldn't remember what had happened or at least had a disjointed memory," and she "couldn't describe in any detail what had happened or what she had done." According to Dr. McNeese, the only things Marilyn could remember about the trial were "nasty questions," although she could not remember what the questions were. When Dr. McNeese saw Marilyn on March 28, he did not observe any of the symptoms of acute stress disorder.

Based on his observations of Marilyn on April 4, 2014, Dr. McNeese testified that his opinion within a reasonable degree of medical certainty was that "at the time of trial, she was most likely -- that is most likely the trigger that began a cascade of the development of symptoms associated with acute stress disorder." When asked whether Marilyn was suffering from acute stress disorder on the day of trial, Dr. McNeese testified, "That was -- at least was the trigger that began triggering the symptoms." When asked about his opinion of Marilyn's competency on the day of trial, Dr. McNeese testified "it was a high probability of being compromised at that time."

On cross-examination, Dr. McNeese acknowledged he was unable to determine whether the onset of Marilyn's acute stress disorder was in the morning or the afternoon of the day of trial or even 1, 2, or 3 days later. He also agreed that if a person was able to recall events from 1, 5, or 10 years ago, that might be a sign the person was not at that moment suffering from acute stress disorder. Dr. McNeese acknowledged he had not reviewed the transcript of Marilyn's trial testimony and agreed that Marilyn's ability to remember the guests at a dinner and how many wine

glasses were at each place setting was an indication she had the use of her memory on the day of trial.

Marilyn also testified at the evidentiary hearing. She had very little recollection of what happened on the day of trial. She did not remember being in "this room"; she also remembered speaking into a "long microphone" different from the microphone in front of her. (At this point, David's counsel interrupted and asked the court to take judicial notice that the trial was held in a different courtroom, and the court took judicial notice of this fact.) Marilyn further testified she did not recall being questioned by her attorney; she only remembered being asked "cruel questions" by David's counsel.

When shown a copy of exhibit 2, the signed partial property settlement agreement, Marilyn acknowledged her signature was on it, but testified she had no recollection of signing it. She also testified she had read the agreement and that she "would not have agreed to sign it." When asked to identify the specific provisions she would not have accepted, Marilyn identified the health insurance provision, which provided, "Each party is covered by Medicare; as such, neither party shall be required to continue coverage on the other." She also identified the alimony provision as one to which she would not have agreed; that provision stated, "This issue is reserved for later agreement or decision by the Court." Upon further questioning by her counsel, Marilyn agreed there were "numerous components" of the partial property settlement agreement to which she would not have agreed; however, she did not specifically identify the objectionable provisions.

On cross-examination, Marilyn was shown a prior draft of the partial property settlement agreement dated November 19, 2013. Marilyn testified she recognized her signature on the document, but stated she felt "very pressured" and "forced to sign some things." (The draft of the partial property settlement agreement contained many of the same provisions as the final version signed the morning of trial, including the same allocation of the parties' real property, the same reservation of alimony, and a substantially similar health insurance provision.)

On September 23, 2014, at David's counsel's request, the evidence was reopened on Marilyn's motion for new trial or, alternatively, to alter or amend the decree. David's counsel offered exhibit 60, which was a printout from the Seward County Assessor's website showing that on August 28, 64 acres of the land owned by DAMAR had been sold to a third party for $195,000. The court received the exhibit without objection.

On October 1, 2014, the court entered a written order overruling Marilyn's motion for new trial or, alternatively, to alter or amend the decree. The court found that Marilyn had been competent to testify at trial. The court did not agree with Dr. McNeese's opinion that she had been incompetent, noting that Dr. McNeese did no formal evaluation or testing to arrive at his opinion, he was not present at trial, and he was unable to determine whether the onset of Marilyn's acute stress disorder was before, during, or after trial. The court also noted that on the day of trial the court observed that Marilyn "was of sufficient mental ability to perceive events, describe them and accurately recall them and relate them to the Court through her testimony." The court further determined that because Marilyn had received the benefits of the settlement agreement by selling part of the DAMAR real estate, she was estopped from taking the position that the settlement agreement and decree should be set aside.

- 7 -

Marilyn timely filed a notice of appeal to this court from the decree and the order overruling her motion for new trial or, alternatively, to alter or amend the decree.

## ASSIGNMENTS OF ERROR

Marilyn assigns, renumbered, that the district court erred in (1) failing to set aside the partial property settlement agreement and order a new trial on the basis that she was incompetent when she signed the agreement and at the time of trial, (2) determining that her sale of certain property precluded her from challenging the partial property settlement agreement, (3) failing to award her alimony, (4) failing to order David to pay certain of her medical expenses, (5) failing to award her a reasonable attorney fee, and (6) adjusting the parties' marital IRAs for tax consequences before dividing them.

## STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Coufal v. Coufal*, 291 Neb. 378, 866 N.W.2d 74 (2015). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id*. A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*.

An appellate court reviews a trial court's ruling on a motion for a new trial for abuse of discretion. *Balames v. Ginn*, 290 Neb. 682, 861 N.W.2d 684 (2015).

## ANALYSIS

*Failure to Set Aside Partial Property Settlement*
*Agreement and Order New Trial.*

Marilyn assigns that the district court erred in failing to set aside the partial property settlement agreement and order a new trial on the basis that she was not competent when she signed the settlement agreement or at the time of trial. She summarizes Dr. McNeese's testimony concerning her acute stress disorder and asserts he "testified unambiguously" that she "was not competent on the day of trial." Reply brief for appellant at 17. Marilyn "seeks to set aside a settlement agreement and decree which were obtained at a time when she was mentally incapable of comprehending the importance of her actions." Brief for appellant at 19-20.

In support of her competency argument, Marilyn appears to raise two legal issues. She urges that "[m]ental illness may be grounds for setting aside a property settlement agreement." Brief for appellant at 17. She also urges that the district court "clearly had the discretion" under the Nebraska Evidence Rules "to recognize [her] inability to perceive and remember[,] which prejudiced her ability to marshal her evidence and present her case." Reply brief for appellant at 16. At a minimum, Marilyn's arguments require us to address (1) her capacity to execute the partial property settlement agreement and (2) her competency to testify. We address each of these issues separately.

We first address Marilyn's capacity to execute the partial property settlement agreement. Neb. Rev. Stat. § 42-366(1) (Reissue 2008) provides that parties to a dissolution of marriage may enter into a written property settlement agreement containing provisions for, among other things, "the disposition of any property owned by either of them." If the terms of a property settlement are not found unconscionable, the agreement is binding upon the dissolution court and the decree of dissolution must carry the agreement into effect. *Ryder v. Ryder*, 290 Neb. 648, 861 N.W.2d 449 (2015). Marilyn does not identify any provision of the partial property settlement agreement she believes is unconscionable; rather, she seeks to have it set aside on the basis that she was incompetent when she signed it.

Generally speaking, when a party seeks to set aside an instrument for "lack of mental capacity on the part of the person executing such instrument," the party must present clear and convincing evidence "that the mind of the person executing the instrument was so weak or unbalanced when the instrument was executed that the person could not understand or comprehend the purport and effect of what he or she was doing." *Cotton v. Ostroski*, 250 Neb. 911, 918, 554 N.W.2d 130, 135 (1996).

The record establishes that Marilyn executed the final draft of the partial property settlement agreement on the morning of the day of trial, March 31, 2014. Although Marilyn contends that Dr. McNeese "testified unambiguously" that she was incompetent on that date, reply brief for appellant at 16, the record does not support this characterization. At the evidentiary hearing on Marilyn's motion for new trial or, alternatively, to alter or amend the decree, Dr. McNeese testified he saw Marilyn on March 28 and April 4. While Marilyn did not exhibit any symptoms of acute stress disorder on March 28, she did on April 4. According to Dr. McNeese, on April 4 Marilyn was "quite distraught," she "couldn't remember what had happened or at least had a disjointed memory," and she "couldn't describe in any detail what had happened or what she had done." Dr. McNeese's opinion within a reasonable degree of medical certainty was that "at the time of trial, she was most likely -- that is most likely the trigger that began a cascade of the development of symptoms associated with acute stress disorder." Upon further questioning into Marilyn's competency on the day of trial, Dr. McNeese testified that "it was a high probability of being compromised at that time."

On cross-examination, however, Dr. McNeese acknowledged he was unable to determine whether the onset of Marilyn's acute stress disorder was in the morning or the afternoon of the day of trial or even 1, 2, or 3 days later. He also had not reviewed Marilyn's trial testimony and agreed that Marilyn's ability to remember the guests at a dinner and how many wine glasses were at each place setting was an indication she had the use of her memory at trial.

Based on Dr. McNeese's testimony, the district court did not abuse its discretion in refusing to set aside the partial property settlement agreement. Dr. McNeese's testimony did not establish that when Marilyn executed the agreement her mind was so weak or unbalanced that she could not understand or comprehend the purport and effect of what she was doing. At most, his testimony established that the trial triggered Marilyn's acute stress disorder and that she began exhibiting symptoms of the disorder at an unspecified point during or after trial. Nothing in Dr. McNeese's testimony established that Marilyn was incompetent at the time she signed the agreement.

Marilyn's testimony provides even less support for her competency argument. At trial, when asked about the partial property settlement agreement, Marilyn agreed it had taken "a long time to get to this point." In addition, she agreed she had been given an adequate opportunity to reflect on the agreement after talking with her attorney and her brother; she believed the agreement was fair and wanted the court to approve it; and she affirmed there was nothing about the agreement that she did not understand or about which she was confused. Although she testified at the evidentiary hearing on her motion for new trial that she had read the agreement and that she "would not have agreed to sign it," she was impeached on cross-examination with an earlier draft of the property settlement bearing her signature. The earlier draft, dated November 19, 2013, was substantially similar to the final agreement approved by the court; significantly, Dr. McNeese expressed no doubt as to Marilyn's competency prior to the day of trial, including when she signed the earlier draft.

Furthermore, Marilyn's testimony at trial revealed that not only did she understand the key provisions of the partial property settlement agreement, she had already made plans at the time of trial for the property she was slated to receive. She explained at trial that she agreed to receive the DAMAR property so that her son could continue to live there. She further explained that she planned to sell some of the DAMAR property to a third party and to sell approximately 90 acres of the property to her son. She planned to rent the remaining acres to her son for $1 per year. Obviously, Marilyn understood and comprehended the purport and effect of what she was doing when she signed the agreement.

We now turn to Marilyn's competency to testify at trial. Neb. Rev. Stat. § 27-601 (Reissue 2008) provides that "[e]very person is competent to be a witness except as otherwise provided in these rules." The only persons explicitly deemed incompetent to testify are jurors and judges. See Neb. Rev. Stat. §§ 27-605 and 27-606 (Reissue 2008). Although § 27-601 generally eliminates all grounds of witness incompetency, including lack of mental capacity, this does not mean a court is completely without discretion to exclude testimony from a witness totally lacking in mental functioning. R. Collin Mangrum, *Nebraska's Evidentiary Rules Regarding Witnesses*, 28 Creighton L. Rev. 55, 58 (1994). See, also, Nebraska Supreme Court Committee on Practice and Procedure, Proposed Nebraska Rules of Evidence at 88 (1973) (explaining that although then-proposed Rule 601 generally eliminated all grounds of witness incompetency, rules 403 and 602 were "sufficient to enable the judge to cope with such matters as the testimony of a three-year-old child").

Under Neb. Rev. Stat. § 27-403 (Reissue 2008), a court can exclude otherwise relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Thus, "[i]f the witness lacks cognitive ability to perceive, remember, narrate, or testify truthfully, the probative value of the testimony would be substantially outweighed by the danger of confusion, unfair prejudice, or waste of time." Mangrum, *supra* at 58. Similarly, Neb. Rev. Stat. § 27-602 (Reissue 2008) requires a court to exclude testimony as to matters about which a witness does not have personal knowledge. As one commentator has explained, "[t]he ultimate question . . . is whether the witness is so bereft of his powers of observation, recordation, recollection or narration as to be so thoroughly untrustworthy

as a witness as to make his testimony lack relevancy." 4 Michael H. Graham, Handbook of Federal Evidence § 601:2 (7th ed. 2012). Generally, questions of witness competency lie within the trial court's discretion. See *State v. Earl*, 252 Neb. 127, 560 N.W.2d 491 (1997) (addressing the question of the competency of a child witness).

In *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032 (8th Cir. 2007), which was a diversity case in which the federal court applied § 27-601, the driver of a bus that was rear-ended by a semi-trailer truck testified in the resulting negligence case. The driver suffered from a "serious brain impairment" partly due to the collision and could not handle her business and legal affairs; her brain injury also made "'normal thinking and processing almost impossible.'" *Id.* at 1036. The Eighth Circuit held it was not an abuse of discretion to allow her testimony. *Id.* Similarly, in *United States v. Peyro*, 786 F.2d 826 (8th Cir. 1986), decided under Federal Rule of Evidence 601, which is substantially similar to § 27-601, the Eighth Circuit held it was not error to refuse to strike the testimony of a witness who conceded she had "'some very substantial memory problems'" and was "'emotionally unbalanced'"; in that case, the district court determined that while the witness could not "recall detail," she had a "'broad, general recollection.'" *Id*. at 830-31.

Applying these principles to the present case, we conclude Marilyn was competent to testify on the day of trial. Even assuming she was suffering from acute stress disorder as she sat on the witness stand, our reading of her trial testimony reveals the disorder did not deprive her of her powers of observation, recordation, recollection, or narration. Rather, as the district court found, Marilyn "was of sufficient mental ability to perceive events, describe them and accurately recall them and relate them to the Court through her testimony." Even Dr. McNeese acknowledged that Marilyn's ability to remember the guests at a dinner and how many wine glasses were at each place setting was an indication she had the use of her memory on the day of trial. Under these circumstances, the court did not abuse its discretion in denying Marilyn's motion for new trial on grounds that she was incompetent to testify on the day of trial.

Because we have determined the district court did not abuse its discretion in declining to set aside the partial property settlement agreement or order a new trial, we need not address Marilyn's argument that the court erred in determining that her sale of certain property precluded her from challenging the partial property settlement agreement. See *Johnson v. Nelson*, 290 Neb. 703, 861 N.W.2d 705 (2015) (an appellate court need not engage in an analysis that is not necessary to adjudicate the case before it). We now turn to Marilyn's challenges to the decree.

*Alimony.*

Marilyn assigns that the district court erred in refusing to award her alimony. In arguing she was entitled to alimony, she relies on the 25-year duration of the parties' marriage and her contributions to the marriage. She also discusses her numerous health problems, her need for full-time assistance, and her brother's plans to cease caring for her. She further notes David's higher income and considerably greater resources.

David responds that Marilyn received the DAMAR farm, which was the only income-producing asset of the marriage. He further argues that Marilyn refuses to take advantage of the income available to her by declining to withdraw from her IRA until age 70½ and by renting

her DAMAR acreage to her son for $1 per year. David also contends that many of Marilyn's claimed expenses were speculative, including the cost of an assisted living facility.

Under Neb. Rev. Stat. § 42-365 (Reissue 2008), courts should consider four factors relative to alimony: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. Courts should also consider the income and earning capacity of each party, as well as the general equities of the situation. *Binder v. Binder*, 291 Neb. 255, 864 N.W.2d 689 (2015). In reviewing an alimony award, an appellate court does not decide whether it would have awarded the same amount of alimony as the trial court, but instead whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Id*. Reasonableness is the ultimate criterion. *Id*.

Marilyn and David were married for 25 years. Although Marilyn contributed to the marriage by doing household chores and yardwork, serving as the "chief cook and bottle washer" when the parties entertained at their home, and working on the DAMAR farm, there is no evidence Marilyn sacrificed employment or educational opportunities during the marriage. Rather, when Marilyn married David in 1988 at approximately age 39, she had already worked at a company in Lincoln for 15 years and she continued working there for another 16 years before retiring in 2004. Because no children were born during the marriage, neither Marilyn nor David sacrificed careers or educations to care for children.

Looking to the parties' circumstances, Marilyn focuses on her health problems and alleged need for full-time assistance. Marilyn's brother Stanley, who had been living with Marilyn for 6½ years at the time of trial, testified in detail regarding the assistance he provided Marilyn, including shopping for her, driving her to appointments, preparing meals, and doing housework. He had been providing this assistance free-of-charge, although in September 2013 Marilyn insisted he stop paying rent of $500 per month because of the care he was providing her. Stanley testified he intended to stop living with Marilyn because he did not believe he could continue providing her with adequate care. Although he testified he intended to begin living in Puerto Rico part of the year and on a farm in Lincoln the remainder of the year, on cross-examination, he testified he would stop living with Marilyn when he had "a chance to." He explained that first Marilyn needed to "find a facility that will take care of her."

Marilyn's list of monthly expenses received in evidence included rent of between $2,500 and $3,700 per month for an assisted living facility, plus $500 per month for a transportation service she planned to use at the facility. On cross-examination, however, Marilyn indicated she had not applied for a room in an assisted living facility. Furthermore, despite her claimed intention to enter such a facility, Marilyn's monthly expenses included $1,250 for home maintenance and home health care, plus additional expenses for utilities. Marilyn also testified she hoped to spend 3 to 4 months per year in Puerto Rico and claimed to require $1,000 per month for travel expenses, which were elevated due to her need to travel with "service dogs." She also contributed $7,500 toward the purchase of Stanley's home in Puerto Rico, which Stanley testified was "three months' rent up front."

Marilyn's primary care physician, Dr. Daniel Einsphar, testified in his deposition received into evidence that Marilyn "wouldn't live in a safe situation" if she lived independently. However, Dr. Einsphar believed Marilyn could remain in her home if she had someone coming in on a daily basis to assist her with certain tasks. Dr. Einsphar acknowledged that given her history of "alcohol consumption," Marilyn might benefit from greater supervision, such as she would receive in an assisted living facility.

Although Marilyn concludes from this evidence that she "is in need of full-time assistance," brief for appellant at 12, the evidence does not necessarily support this conclusion. At a minimum, Marilyn needs some form of assistance, but the evidence suggests that someone coming to her house part-time on a daily basis would be sufficient. Moreover, it is speculative at this point to conclude that Marilyn will enter a costly assisted living facility, especially considering her expressed plans to spend 3 to 4 months per year in Puerto Rico. At the time of trial, Marilyn did not incur any assistance-related expenses; while Stanley testified he planned to cease assisting Marilyn, he also testified she had prepaid 3 months' rent for living in his Puerto Rico home. Viewing the evidence as a whole, there is significant doubt surrounding Marilyn's future assistance-related expenses.

Marilyn also relies on David's "considerably" greater resources to support her claim for alimony. Brief for appellant at 16. In the dissolution, Marilyn received the 255.3-acre DAMAR farm appraised at $876,000; an IRA valued at $743,326 including the $78,006 payment from David's IRA; the home on Sumner Street of unknown value; 39.29 acres of land in Lancaster County of unknown value; and had $140,000 remaining from an inheritance received during the marriage. Even without knowing the value of the Sumner Street home or the Lancaster County acreage, Marilyn's assets total $1,759,326; all of her assets are debt free. David received the home in Puerto Rico of unknown value, the cabin in Minnesota of unknown value, an IRA valued at $795,331 after paying $78,006 to Marilyn, and a premarital retirement account with a balance of $1,810,880. Without knowing the values of all of the assets, it nevertheless appears that David's total assets are greater than Marilyn's; however, much of the difference comes from David's premarital retirement account valued at $1,810,880.

The Nebraska Supreme Court has explained that a court "may consider all of the property owned by the parties--marital and separate--in decreeing alimony." *Binder v. Binder*, 291 Neb. 255, 864 N.W.2d 689 (2015). See, also, *Ainslie v. Ainslie*, 249 Neb. 656, 545 N.W.2d 90 (1996) (explaining that a court may consider marital and nonmarital property in entering a decree for alimony). In *Binder, supra*, the court affirmed an award of alimony to a 95-year-old woman who resided in a nursing home at the time of trial and had exhausted nearly all of her assets; in that case, the ex-husband was retired and earned no income but had 200 acres of premarital farmland at his disposal. Similarly, in *Ainslie, supra*, the court affirmed an award of alimony to a 67-year-old man who had limited income and earning capacity and little-to-no assets; the ex-wife did not work but received $32,000 per year in income from two nonmarital trusts. Her interests in the trusts were valued at over $900,000. *Id*.

The present case is distinguishable from *Binder* and *Ainslie*. The parties receiving alimony in both of those cases had little or no income or assets, while the obligor spouse had significant resources in the form of nonmarital property or income. Under the circumstances of those cases,

it was not an abuse of discretion to, in essence, order the obligor spouse to use his or her nonmarital property to fund an award of alimony. In the case before us, similar circumstances are not present. Although David has a valuable premarital retirement account, Marilyn has substantial assets at her disposal. Moreover, she has made the voluntary decision not to maximize the income available to her from those assets, including renting her DAMAR farmland to her son for only $1 per year and by not taking distributions from her IRA. Under these circumstances, we do not believe that David's income from his premarital retirement account renders the court's decision not to award alimony an abuse of discretion.

Considering all of the relevant factors and evidence, we conclude the district court did not abuse its discretion by not awarding alimony to Marilyn.

*Medical Expenses.*

Marilyn also assigns that the district court erred in failing to order David to pay certain of her medical expenses. She relies on the June 14, 2013, temporary order in which the district court ordered David to pay Marilyn's "reasonable and medically necessary non-covered healthcare expenses." According to Marilyn, the non-covered medical expenses listed in exhibits 29 and 30 were medically necessary. Regarding the prescription costs listed in those exhibits, she argues that "[t]he fact that the medications were prescribed by a physician inherently indicates that they were medically necessary." Brief for appellant at 22. Marilyn also notes that Dr. McNeese wrote in a letter (received in evidence as exhibit 21) that her treatment with him was medically necessary.

Having reviewed the evidence relevant to Marilyn's claim for non-covered healthcare expenses, we conclude the district court did not abuse its discretion in ordering David to pay only $218.14 of her claimed expenses. Exhibit 29 contains a list of non-covered medical expenses Marilyn incurred during 2013 and 2014 prior to trial. Of those expenses, the court ordered David to pay only $218.40 for prescription medications that Marilyn obtained on January 1, 2014 (which exhibit 29 identifies as Lisinopril, Doxycycline, Vitamin D2, and Finasteride). The remaining expenses listed on the exhibit include "various RXs" obtained on February 1, 2014, at a cost of $36.04; "7 various RXs" obtained on February 5, 2014, at a cost of $172.94; and "Hydrocodone Acetaminophen" obtained on February 15, 2014, at a cost of $30. These vague entries, which other than "Hydrocodone Acetaminophen" fail to identify the names of the medications or the prescribing physician, are insufficient to establish that they were "reasonable and medically necessary non-covered healthcare expenses."

Exhibit 30 is the itemized bill from Dr. McNeese's office showing an outstanding balance of $5,410.28 as of March 18, 2014. The bill indicates that a total of $5,273 of those charges were pending with insurance. Even accepting Marilyn's testimony that the cost of the Vivitrol injections, which constituted a large portion of the outstanding balance, was not covered by insurance, Marilyn did not establish that her treatment with Dr. McNeese was medically necessary. Dr. McNeese was a licensed psychologist, not a medical doctor. Dr. Einsphar, who was a medical doctor, testified in his deposition that the Vivitrol injections were "helpful," but he declined to call them medically necessary. He expressed the same opinion regarding Marilyn's massage and aqua therapies.

- 14 -

*Attorney Fees.*

Marilyn also assigns that the district court erred in failing to award her attorney fees. She relies on the same factors she relied upon in support of her claim for alimony. She cites her significant expenses and David's greater income and assets. She contends that the "equities require that David contribute to [her] attorney fees." Brief for appellant at 24.

In a marital dissolution action, an award of attorney fees depends on a variety of factors, including the amount of property and alimony awarded, the earning capacity of the parties, and the general equities of the situation. *Molczyk v. Molczyk*, 285 Neb. 96, 825 N.W.2d 435 (2013). We have already addressed Marilyn's arguments concerning these factors in the context of alimony. For the same reasons we concluded it was not an abuse of discretion to deny alimony, we conclude the court did not abuse its discretion by denying Marilyn an award of attorney fees.

*IRA Allocation.*

Marilyn's final assignment of error is that the district court erred in adjusting the parties' marital IRAs for tax consequences before dividing them. As recounted above, the court ordered David to pay $78,006 to Marilyn to effect an equal division of the parties' marital IRAs. In doing so, the court accepted Marilyn's proposal that the court "tax effect each account at the rate of 25%" prior to dividing them. Marilyn testified at trial that exhibit 25, a document entitled "Plaintiff's Proposed Allocation of Individual Retirement Accounts," was her "suggestion to the Court on how to deal with the two IRA accounts that are marital property." The exhibit proposed that after reducing the IRAs by 25% and dividing them equally, David owed Marilyn $78,006.

A party cannot complain of error which that party has invited the court to commit. *Medlock v. Medlock*, 263 Neb. 666, 642 N.W.2d 113 (2002). The district court accepted Marilyn's proposal regarding how to divide the parties' IRAs, and she cannot now complain of that division on appeal. We reject Marilyn's assertion that the parties' agreement that the IRAs should be reduced for tax consequences prior to dividing them was an invalid stipulation as to a matter of law. Marilyn's proposed division of the IRAs concerned the division of property, a matter within the trial court's discretion, not a question of law.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court for Lancaster County.

AFFIRMED.